IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

DARRYL MALLOY
    Defendant.

Criminal No.: ELH-14-187

**MEMORANDUM OPINION**

This Memorandum Opinion concerns a second motion for compassionate release filed by defendant Darryl Malloy, pursuant to 18 U.S.C. § 3582(c)(1)(A). ECF 29 (the "Motion"). The motion is supported by two exhibits. ECF 29-1; ECF 29-2. Malloy, who is self-represented, was sentenced on August 8, 2014, to a term of twelve years' imprisonment (144 months) for the offense of possession with intent to distribute 100 grams or more of heroin, in violation of 21 U.S.C. § 841. ECF 18 (Judgment). The sentence was imposed concurrent with a sentence defendant was then serving in a Maryland State prison.

By Order of July 16, 2020 (ECF 28), the Court considered and denied defendant's earlier request for compassionate release, without prejudice. ECF 24 (the "First Motion"). In particular, the Court denied the First Motion, because defendant had "not established that he exhausted all administrative remedies as required in 18 U.S.C. § 3582(c)(1)(A)." ECF 28 at 4.

In his Motion, Malloy asks this Court to reduce his "sentence to time served," and he seeks "home confinement for a period of time under the direction of the USPO." ECF 29 at 8. The government opposes the Motion (ECF 32, the "Opposition"), supported by an exhibit. ECF 32-1 (opinion in another case). Malloy has not replied.

No hearing is necessary to resolve the Motion. Local Rule 105.6.  For the reasons that follow, I shall grant the Motion.

## I.     Background

Malloy was charged in a one-count Indictment on April 17, 2014, with the offense of possession with intent to distribute 100 grams or more of a mixture or substance containing a detectable amount of heroin, in violation of 21 U.S.C. § 841(a)(1). ECF 1. The offense carried a mandatory minimum term of five years imprisonment, with a maximum of 40 years. ECF 16 (Presentence Report or "PSR"), ¶ 51; *see* 21 U.S.C. § 841(b)(1)(B)(i).

Pursuant to a Plea Agreement (ECF 11), Malloy entered a plea of guilty on June 4, 2014, to Count One of the Indictment. ECF 9. [1]  The plea was tendered under Fed. R. Crim. P. 11(c)(1)(C) ("C Plea"), by which the parties agreed to a sentence of 144 months (12 years) as the appropriate disposition. ECF 11, ¶ 7. As noted, the sentence was to run concurrent with a sentence imposed in a Maryland State case.

In the Plea Agreement, the parties stipulated to the following facts, *id.* ¶ 9:  "On November 15, 2013, the defendant purchased more than 100 grams of heroin in Towson, Maryland, and transported that quantity of heroin to Edgewood, Maryland, specifically to the Ramada Inn where he had been staying and where he intended to break down and package the heroin for distribution." *Id.*

The Plea Agreement contemplated a base offense level of 37 and a criminal history category of VI, pursuant to the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.").

---

[1] I note that the Plea Agreement (ECF 11) incorrectly states that the offense carried a mandatory minimum term of ten years of imprisonment, with a maximum of life.  *Id.* ¶ 4.

ECF 11, ¶ 9.  After three deductions for acceptance of responsibility under U.S.S.G. § 3E1.1, the Plea Agreement anticipated a final offense level of 34.  *Id.*

The PSR (ECF 16) reflects that the defendant, born in 1982 (*id.* at 1), has a long criminal history.  *Id.* ¶¶ 24-39.  This resulted in his designation as a career offender under U.S.S.G. § 4B1.1(a), and a criminal history category of VI.  *Id.* ¶¶ 18, 39.[2]  However, the PSR's calculation of the offense level did not comport with the Plea Agreement.

In particular, the PSR reflected a base offense level of 26.  *Id.* ¶ 12.  But, based on defendant's career offender status, his offense level was increased to 34.  *Id.* ¶ 18.  After deductions for acceptance of responsibility, the PSR reflected a final offense level of 31.  *Id.* ¶ 21.  And, it appears that at sentencing the parties agreed to another two-level reduction in the offense level, based on the then forthcoming changes to the drug quantity table.  *See* ECF 19 (Statement of Reasons) at 1.  Therefore, the defendant had a final offense level of 29, rather than the offense level of 34, contemplated by the Plea Agreement.  *Id.*

Sentencing was held on August 8, 2014.  ECF 17.  At that time, Malloy was thirty-two years old.  *See* ECF 16 at 1. As noted, Malloy had a final offense level of 29 and a criminal history category of VI.  Therefore, the Guidelines called for a period of imprisonment ranging from 151 to 188 months.  ECF 19.  If defendant were not a career offender, however, his Guidelines would have called for a sentence ranging from 70 to 87 months, based on an offense level of 23 and a criminal history category of IV.[3]

---

[2] But for defendant's career offender status, he would have had a criminal history category of IV.  ECF 16, ¶ 38.

[3] It is not clear whether Malloy would have been entitled to an additional deduction of two levels, based on then forthcoming changes to the drug quantity table.

Of pertinence here, defendant's prior record included two felony drug distribution convictions. ECF 16, ¶¶ 28-30, 34-36, 39. In particular, in June 2005 Malloy pleaded guilty to possession with intent to distribute narcotics, for which he was sentenced to two years of imprisonment. *Id.* ¶ 28. And, in February 2013 defendant pled guilty to distribution of narcotics, for which he was sentenced to 20 years' incarceration, of which twelve years and eight months were suspended, followed by three years of probation. ECF 16, ¶ 34.

Defendant reported a history of use of marijuana, ecstasy, barbiturates, prescription medication, and embalming fluid. *Id.* ¶ 70. He also reported that, prior to his arrest, he drank beer to intoxication approximately two to three times a week. *Id.* Although defendant previously participated in substance abuse treatment programs, he had little or no success. *Id.* Nonetheless, Malloy "intimated he is ready to lead a sober life." *Id.* And, he "expressed interest in the 500-hour Residential Drug and Alcohol Program (RDAP) offered by the Bureau of Prison[s]." *Id.*

Pursuant to the C Plea, I imposed a sentence of 144 months' imprisonment, to run concurrent with the defendant's Maryland state sentence. And, I recommended credit for time served since November 25, 2013. ECF 18 at 2.[4]

Thereafter, on April 22, 2020, defendant submitted his First Motion. ECF 24. As mentioned, by Order of August 31, 2021 (ECF 28), I denied the First Motion, as Malloy had "not established that he exhausted all administrative remedies as required in 18 U.S.C. § 3582(c)(1)(A). *Id.* at 4.

Malloy then submitted a request for compassionate release to the Warden on July 20, 2021. ECF 29-1 at 2. That request was denied on August 13, 2021. *Id.* Malloy sought an administrative

---

[4] Malloy was arrested by the State on November 16, 2013, in connection with the same conduct. He has been in custody since that date. ECF 16 at 1. He is entitled to credit because the State case was nolle prossed. *See id.* at ¶ 48.

remedy, asking the Warden to reconsider his request for compassionate release.  ECF 29-1 at 3.
That request was also denied.  *Id.*

This Motion followed on October 25, 2021. ECF 29. Malloy notes that, in light of the
COVID-19 pandemic, his asthma constitutes an extraordinary and compelling reason for
compassionate release. *Id.* at 3. Malloy also states that he "is not a risk to the community," has
"family support," and he intends "to be a productive citizen." ECF 29. at 7.

The government does not contest that Malloy has exhausted his administrative remedies.
But, it contends that Malloy's asthma is not severe enough to warrant compassionate release. ECF
32 at 16-17.  And, the government argues that Malloy "should not be granted compassionate
release because he has refused to be vaccinated." *Id.* at 17.

Malloy is currently serving his sentence at FCI Sandstone.[5] He has a projected release date
of May 16, 2024.  *See Find an inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/
(last accessed Apr. 3, 2023).[6]  To date, Malloy has served approximately 90% of his sentence.

Additional facts are discussed, *infra*.

## II.  Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed."
18 U.S.C. § 3582(c); *see United States v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *United States
v. Bond*, 56 F. 4th 381, 383 (4th Cir. 2023); *United States v. Bethea*, 54 F.4th 826, 831 (4th Cir.

---

[5] Malloy appears to have moved throughout the federal prison system. *See* ECF 27 at 2
(indicating that Malloy was housed in FCI Forrest City Low); ECF 29 at 4-6 (Malloy states he is
housed in FCI Morgantown); ECF 32 at 1 (noting that Malloy was housed in Ashland FCI). The
Bureau of Prison's inmate locator tool now shows that Malloy, "Register Number: 57989-037," is
housed in FCI Sandstone. *See Find an inmate*, Federal Bureau of Prisons,
https://www.bop.gov/inmateloc/ (last accessed Apr. 3, 2023).

[6] The government indicates that defendant has a release date of May 16, 2025.  *See* ECF
32 at 1.

2022); *United States v. Ferguson,* 55 F.4th 262, 267 (4th Cir. 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Congress "broadened" the authority of the courts in 2018, with passage of the First Step Act ("FSA"), Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) (codified as 18 U.S.C. § 3582(c)(1)(A)). *Malone*, 57 F.4th at 173. Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction." *Hargrove*, 30 F.4th at 194. This provision is an exception to the ordinary rule of finality in regard to a federal sentence. *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was first enacted as part of the Sentencing Reform Act of 1984. Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief. *See Bethea*, 54 F.4th at 831; *see*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished. The BOP rarely filed motions on an inmate's behalf. As a result, compassionate release was exceedingly rare. *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66

(2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

As a result of the enactment of the FSA in December 2018, a federal inmate is now permitted to file a motion for compassionate release directly with the court after exhaustion of administrative remedies.  *See United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020). Specifically, pursuant to the 2018 FSA, the Court may reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  (Emphasis added).  *Id.*

Once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, the defendant may petition a court directly for compassionate release.  *Ferguson*, 55 F.4th at 268; *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.  This constituted a sea change in the law.

But, under 18 U.S.C. § 3582(c)(1)(A), the court may modify the defendant's sentence only if two criteria are met.  *Bethea*, 54 F.4th at 831.  In other words, the analysis consists of "two steps."  *Bond*, 56 F.4th at 383.  And, for a court to award compassionate release, it must conclude that the movant satisfies both criteria.  *Bethea*, 54 F. 4th at 831; *see Hargrove*, 30 F.4th at 194-95.

"First, the court must determine the prisoner is eligible for a sentence reduction because he has shown 'extraordinary and compelling reasons' supporting relief."  *Bethea*, 54 F.4th at 831 (citation omitted); *see also Bond*, 56 F.4th at 383; *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021).  If that criteria is met,

the court "must then find that release is appropriate under the 18 U.S.C. § 3553(a) sentencing factors, to the extent those factors are applicable." *Bethea*, 54 F.4th at 831; *see also Malone*, 57 F.4th at 174; *Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021); *Kibble*, 992 F.3d at 330.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169. But, the Fourth Circuit has said: "When deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release. *See McCoy,* 981 F.3d at 276-77.[7] In particular, U.S.S.G. § 1B1.13 provides that on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application

---

[7] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C). *See McCoy,* 981 F.3d at 276.

Note 1(D), titled "Other Reasons," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

However, as the Fourth Circuit has recognized, there is no applicable policy statement for a motion filed by a defendant under § 3582(c)(1)(A). *See, e.g.*, *Malone*, 57 F.4th at 174; *McCoy*, 981 F.3d at 276. Of significance here, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the FSA. It is *only* "directed at BOP requests for sentence reductions." *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13). Thus, "[b]y its plain terms. . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Brooker,* 976 F.3d 228, 235-36 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. And, because there is currently no Sentencing Commission policy statement applicable to a defendant's compassionate release motion, "district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to [U.S.S.G.] § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283; *see also Hargrove*, 30 F.4th at 194-95; *United States v. Brice*, 2022 WL 3715086, at *1 (4th Cir. Aug. 29, 2022) (per curiam). Although there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release., U.S.S.G. § 1B1.13 "remains helpful

guidance . . . ." *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194.  Consequently, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (citation omitted); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 30 F.4th at 197.  But, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons. *United States v. Harris*, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam).  Nevertheless, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, 2022 WL 127900, at *1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *Harris*, 2022 WL 636627, at *1; 28 U.S.C. § 994(t).  Moreover, "[i]n deciding a motion for compassionate release, the district court is confined to the evidence presented." *Bethea*, 54 F.4th at 833 n.2; *see also United States v. Osman*, 2022 WL 485183, at *1 (4th Cir. Feb. 17, 2022).

The Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169.  However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.

Of relevance here, the Supreme Court decided *Concepcion v. United States*, ___ U.S. ___, 142 S. Ct. 2389 (2022), on June 27, 2022.  In that case, the Supreme Court said, in the context of § 404(b) of the First Step Act, that "a district court cannot . . . recalculate a movant's benchmark Guidelines range in any way other than to reflect the retroactive application of the Fair Sentencing Act [of 2010] . . . ." *Id.* at 2402 n.6.  The Court explained that the "Guidelines range 'anchor[s]'

the sentencing proceeding . . . .  The district court may then consider postsentencing conduct or nonretroactive changes . . . with the properly calculated Guidelines range as the benchmark." *Id.* (first alteration in original; internal citation omitted); *see also United States v. Troy*, ___ F.4th ___, 2023 WL 2669649, at *2 (4th Cir. Mar. 29, 2023).

To be sure, the district court is obligated to consider all non-frivolous arguments for sentence reduction based on intervening changes in the law and factual developments. *Concepcion*, 142 S. Ct. at 2396; *Troy,* 2023 WL 2669649, at *3; *United States v. Reed*, 58 F.4th 816, 822 (4th Cir. 2023); *Brice*, 2022 WL 3715086, at *2.  However, such changes do not warrant a recalculation of the Guidelines.  *Troy*, 2023 WL 2669649, at *3.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020).  And, compassionate release is a "rare" remedy.  *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

As explained, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, that does not end the inquiry.  The second step requires the court to consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *United States v. Mangarella*, 57 F.4th 197, 200, 203 (4th Cir. 2023); *Malone*, 57 F.4th at 174; *Bethea*, 54 F.4th at 833; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *Martin*, 916 F.3d at 397; *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling

11

reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors).

Of relevance, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018); *High*, 997 F.3d at 187. But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167.

Moreover, where appropriate, the district court "must account not only for the circumstances at the time of the original offense but also for significant post-sentencing developments." *Mangarella*, 57 F.4th at 203; *see Martin*, 916 F.3d at 397; *Kibble*, 992 F.3d at 334 n. 3. That said, "[h]ow much explanation is 'enough' depends on the complexity of a given

case." *United States v. Gutierrez*, ___ Fed. App'x ___, 2023 WL 245001, at *3 (4th Cir. Jan. 18, 2023); *see United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021).

Notably, "it weighs against an abuse of discretion—and is viewed as 'significant'—when the same judge who sentenced the defendant rules on the compassionate release motion." *Bethea*, 54 F.4th at 834; *see Gutierrez*, 2023 WL 245001, at *5; *Hargrove*, 30 F.4th at 200; *High*, 997 F.3d at 189.  Moreover, "the district court is less likely to have abused its discretion if it considered arguments in opposition to its ultimate decision." *Bethea*, 54 F.4th at 834; *see also High*, 997 F.3d at 189; *Kibble*, 992 F.3d at 332.

As the Fourth Circuit has observed "'many case-specific facts fit under the broad umbrella of the Section 3553(a) factors.'"  *Bond*, 56 F.4th at 384 (quoting *United States v. Jackson*, 952 F.3d 492, 500 (4th Cir. 2020)).  And, in weighing the § 3553(a) factors, the court may consider the terms of a plea bargain.  *Bond*, 56 F.4th at 384-85.

In any event, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case."  *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190).  And, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'"  *Cohen*, 2022 WL 2314302, at *1 (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).  In doing so, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors when explaining its compassionate release ruling." *Bethea*, 54 F.4th at 834; *see Kibble*, 992 F.3d at 332.

### III. COVID-19[8]

#### A.

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[9]  Two days later, on March 13, 2020, President Trump declared a national emergency concerning the COVID-19 pandemic.  *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19),*  TRUMP  WHITE  HOUSE  (Mar.  13,  2020), https://trumpwhitehouse.archives.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.  That declaration was extended on several occasions.  *See*, *e.g.*, 88 Fed. Reg. 9385 (Feb. 10, 2023).

COVID-19 spawned "a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).  People who are stricken with the coronavirus sometimes experience only mild or moderate symptoms.  But, particularly at the outset, the virus could cause severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first

---

[8] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[9] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S. COVID deaths after losing political battles*, REUTERS (May 12, 2022), https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/. And, as of March 10, 2023, COVID-19 has infected more than 103.8 million Americans.  *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed Mar. 24, 2023).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic.  *Id.*  That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").

For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (August 11, 2022), https://bit.ly/2XoiDDh.  The judiciary, too, faced many operational challenges.  Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus, and the

CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. In February 2023, the CDC updated its guidance to reflect the most available data. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (February 10, 2023), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and possibly hypertension; HIV; being immunocompromised; liver disease; overweight or obesity, where the Body Mass Index ("BMI") is 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis. *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See COVID-19 Risks and Information for Older Adults*, CTRS. FOR DISEASE CONTROL & PREVENTION (February 22, 2023), https://www.cdc.gov/aging/covid19/index.html. Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*, https://bit.ly/38S4NfY.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 30 F.4th at 195. In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk

16

category." *Hargrove*, 30 F.4th at 196.  Nevertheless, the court may consider the CDC's guidelines. *Bethea*, 54 F.4th at 832; *United States v. Petway*, 2022 WL 168577, at *3 (4th Cir. Jan. 19, 2022) (per curiam).  And, "the inquiry should consider whether the underlying condition places the inmate at an increased risk of severe illness from Covid-19."  *Bethea*, 54 F.4th at 832.

**B.**

At the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks.  *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CENTERS FOR DISEASE CONTROL & PREVENTION (JANUARY 26, 2023), https://bit.ly/3dPA8Ba (last accessed Mar. 31, 2023).  However, social distancing is particularly difficult in the penal setting.  *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area.").  Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus.  *Id*.; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance

themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. As the Third Circuit recognized in *United States v. Raia*, 954 F.3d

594, 597 (3rd Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."[10]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP.  The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

On March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney

---

[10] In June 2020, the *New York Times* reported that cases of COVID-19 had "soared in recent weeks" at jails and prisons across the country.  Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; On October 29, 2020, the *New York Times* reported that "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19. *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

C.

Unfortunately, there is no cure for the coronavirus.  But, medical treatments have continued to improve.  And, significantly, we have seen the rollout of four vaccines for COVID-19 (Pfizer, Moderna, Johnson & Johnson, and Novavax).  *See* Rebecca Robbins and Carl Zimmer, *A fourth COVID vaccine is cleared for use in the United States.*, N.Y. TIMES (July 20, 2022), https://www.nytimes.com/2022/07/19/health/cdc-novavax-covid-vaccine.html.  Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since been approved for all persons six months of age and older.  *See* Rhitu Chatterjee, *CDC clears the way for vaccinations for children 6 months to 5 years old*, NPR (June 18, 2022), https://www.npr.org/sections/health-shots/2022/06/18/1105929247/vaccinations-for-children-6-months-to-5-years-old-can-begin-after-cdc-clears-the.

As of March 2023, approximately 69% of the total U.S. population has completed their primary vaccination series (i.e., one dose of a single-dose vaccine or two doses on different days), including 32% of people from ages 5 to 11, 61% of people from ages 12 to 17, 66% of people from ages 18 to 24, 72% of people from ages 25 to 49, 83% of people from ages 50 to 54, and 94% of people ages 65 and up.  *See COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-people-fully-percent-pop5 (last updated Mar. 23, 2023); *Trends in Demographic Characteristics of People Receiving COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://covid.cdc.gov/covid-data-tracker/#vaccination-demographics-trends (last updated Mar. 23, 2023);   Moreover, approximately 54.5 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 5 and older.  *See id.*; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated Mar. 2, 2023).

Federal regulators approved a second and third booster dose for individuals age 50 and older as well as those at higher risk.  *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.  Additionally, on September 1, 2022, the CDC recommended updated COVID-19 boosters from Pfizer-BioNTech for people ages 12 years and older and from Moderna for people ages 18 years and older.  *CDC Recommends the First Updated COVID-19 Booster*, CTRS. FOR DISEASE CONTROL (Sept. 1, 2022), https://www.cdc.gov/media/releases/2022/s0901-covid-19-booster.html

On January 4, 2021, at about the time of the initial vaccine rollout, the BOP published "COVID-19 Vaccine Guidance." *See COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. It provided that administration of the COVID-19 vaccine (Pfizer and Moderna) would "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6. The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. Much has changed since that time.

As of March 24, 2023, the BOP had 145,288 federal inmates and approximately 36,000 staff. And, by that date, the BOP had administered 349,229 vaccine doses to staff and inmates. *See* Bureau of Prisons, https://www.bop.gov/coronavirus/ (last updated Mar. 24, 2023).

**D.**

The number of active COVID-19 cases continues to fluctuate. For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases. *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. Times, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region."). But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.

The Delta variant was thought to be more virulent than earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants"); *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, sparking concern because it was highly contagious. *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021). Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases. *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html. But, the number of COVID-19 cases again declined. *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records.*, WASH. POST (Feb. 7, 2022), https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y. And, the country began to return to normalcy.

Unfortunately, we then experienced another surge in COVID-19 cases.  *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html.  In particular, in the spring of 2022 a new variant of the virus began "spreading rapidly" and soon became "the dominant form of the virus . . . ."  *See* Isabella Grullón Paz, *A new subvariant is spreading rapidly in the United States*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases.  As of July 2022, the BA.5 variant of COVID-19, an "offshoot of the Omicron variant," was "spreading quickly," buttressed by an increased ability to overcome "some of the immune defenses acquired by vaccinated people, or those infected by earlier variants."  Ed Yong, *Is BA.5 the 'Reinfection Wave'?*, THE ATLANTIC (July 11, 2022), https://www.theatlantic.com/health/archive/2022/07/ba5-omicron-variant-covid-surge-immunity-reinfection/670485/.  But, the variant then seemed to subside.  *See COVID Data Tracker: Variant Proportions*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://covid.cdc.gov/covid-data-tracker/#variant-proportions (last updated Mar. 24, 2022).

At this point, COVID-19 has, in a sense, become a fact of life.  *See* Mitch Smith and Julie Bosman, *Covid Deaths Surge Across a Weary America as a Once-Hopeful Summer Ends*, N.Y. TIMES, Sept. 5, 2021,  https://www.nytimes.com/2021/09/05/us/covid-surge-united-states.html ("[T]he coronavirus is going to remain a fact of American life for the foreseeable future.").  In other words, we are in "a more endemic phase of this crisis . . . ."  *See* District of Maryland Standing Order 2022-05, Misc. No. 00-308 (filed Dec. 14, 2022).  Indeed, in an interview in September 2022 on the CBS television show "60 Minutes", President Biden claimed that the pandemic is "over" in the United States.  Alexander Tin, *Biden says Covid-19 pandemic is "over"*

*in U.S.*, CBS NEWS (Sept. 19, 2022).  He stated: "The pandemic is over.  We still have a problem with COVID.  We're still doing a lotta work on it . . . .  But the pandemic is over."  *Id.*

Moreover, on February 10, 2023, President Biden provided notice of his intent to terminate the COVID-19 national emergency, effective May 11, 2023.  *Termination of COVID-19 National Emergency*, ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS (Apr. 3, 2023).  And, Congress has passed a joint resolution (H.J. Res. 7) seeking to end the national emergency, perhaps earlier than May 11, 2023.  *Id.*

In any event, it appears that "virus metrics have stabilized."  Standing Order 2022-05.  And, as Chief Judge Bredar of this Court has noted, in consultation with this court's expert epidemiologist, the virus patterns have changed, with the virus's severity decreasing as "the population has gained some level of immunity from vaccinations and prior infections."  *Id.*  Put another way, the coronavirus may be here to stay, but the acute nature of the crisis has certainly abated.

With respect to the BOP, it has reported that, as of March 24, 2023, 191 federal inmates, out of a total population of 145,288, and 47 BOP staff, out of some 36,000 staff members, currently test positive for COVID-19.  Moreover, 45,031 inmates and 15,219 staff have recovered from the COVID-19 virus.  In addition, 314 inmates and seven staff members have died from the virus.  The BOP has completed 128,642 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to FCI Sandstone, where the defendant is imprisoned, the BOP reported that as of April 3, 2023, out of a total of 1,155 inmates, zero inmates and zero staff members have currently test positive, one inmate and zero staff members have died of COVID-19, and 453 inmates and 71 staff have recovered at the facility.  In addition, 146 staff members and 1,064 inmates have been inoculated with the vaccine at the FCI Sandstone.  *See*

https://www.bop.gov/coronavirus/;                    Bureau            of            Prisons,

https://www.bop.gov/locations/institutions/mck/ (last accessed Apr. 3, 2023).

## IV. Discussion

### A.

Malloy has moved for compassionate release on the ground that his asthma renders him particularly vulnerable to COVID-19.  ECF 29 at 3-4.[11]  He has provided a single page of a medical record, dated February 7, 2019.  ECF 29-2.  Although the Court has considered many compassionate release cases in which the government has submitted a defendant's medical records, the government did not do so here.

Malloy's medical record indicates that he suffers from asthma.  *See* ECF 29-2 at 2.  The document shows that defendant has been prescribed Albuterol, for use up to four times a day, as needed, but he is not to use the medicine every day.  *Id.* at 2.  In addition, he takes daily medication for "Gastro-esophageal reflux disease with esophagitis."  *Id.*  The CDC is clear that people with "moderate-to-severe or uncontrolled asthma are more likely to be hospitalized from COVID-19."  *People with Moderate to Severe Asthma*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html  (last  updated Apr. 7, 2022).  However, based on the record, it does not appear that Malloy's asthma qualifies as "moderate to severe."

Rulings as to asthma as an extraordinary and compelling reason are mixed.  Judge Grimm, a former member of this Court, has noted: "This Court and others have found that the standard of

---

[11] Malloy also argues that the prison conditions at FCI Morgantown render him especially susceptible to COVID-19.  ECF 29 at 4-6.  But, he is now incarcerated at FCI Sandstone. *See United States v. Hernandez-Rodriguez*, CEH-18-319, 2022 WL 17904378, at *4 (M.D. Fla. Dec. 23, 2022) (concluding that defendant's argument that prison conditions at FCI Coleman Low warranted compassionate release was moot because defendant was no longer incarcerated there).

extraordinary and compelling reasons was met during the COVID-19 pandemic where a defendant had a risk of serious complications from COVID-19 based on asthma and other medical conditions. . . . However, in some cases this Court and others have found that mild asthma alone did not a [sic] constitute extraordinary and compelling reasons for release." *United States v. Jennings*, PWG-13-046, 2020 WL 4748462, at *4 (D. Md. Aug. 17, 2020) (collecting cases).

Similarly, another court has remarked: "Because the CDC lists moderate to severe asthma as a condition that can increase the risk of severe illness caused by COVID-19, many courts have distinguished between petitioners with mild/moderate asthma to severe asthma when deciding whether the condition constitutes a compelling and extraordinary circumstance justifying compassionate release. . . . Moderate asthma occurs 'where the individual suffers from daily symptoms, experiences nighttime awakenings more than once a week, uses an Albuterol rescue inhaler on a daily basis, and experiences some limitation of normal activities.'" *United States v. Garcia*, 538 F. Supp. 3d 226, 229 (D. Mass. 2021) (internal citations omitted). *See also, e.g.*, *United States v. Bright*, JAH-17-270, 2022 WL 16951832, at *2-3 (S.D. Cal. Nov. 15, 2022) (concluding that defendant's adequately treated asthma did not constitute an extraordinary and compelling reason to grant compassionate release); *United States v. Armstrong*, RDB-19-357, 2021 WL 2806226, at *3 (D. Md. July 6, 2021) (citing CDC guidance, and declining to find extraordinary and compelling reasons based on asthma adequately managed by prescriptions); *United States v. Malone*, CCB-13-307, 2021 WL 252559, at *1 (D. Md. Jan. 26, 2021) (concluding that asthma alone was not sufficient grounds for compassionate release); *United States v. Daniels*, Crim. No. 15-127, 2020 WL 4674125, at *3 (E.D. Pa. Aug. 12, 2020) (recognizing that moderate to severe asthma could constitute an extraordinary and compelling reason for compassionate release, but concluding that compassionate release was not warranted based on medical records

indicating asthma was under control; defendant was instructed to use Albuterol only to prevent attack, but not daily).

There is no evidence that Malloy suffers from symptoms that require use of an Albuterol inhaler on a daily basis. Nor does the record reflect limitations of normal activities. Indeed, Malloy's asthma appears to be under control. Accordingly, Malloy's asthma would seem to fall in the mild category.

The CDC states that an overweight individual is more "likely to get very sick from COVID-19." *People with Certain Medical Conditions*, *supra*, https://bit.ly/38S4NfY. A person is considered overweight if his BMI is 25 or higher. As of sentencing in 2014, Malloy's height was listed as 5'10" and his weight was listed as 189 pounds. ECF 16, ¶ 69. That equates to a BMI of 27. *See Adult BMI Calculator*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html (last accessed Apr. 7, 2023).

The Court acknowledges that the record does not indicate Malloy's current BMI. However, as noted, the government has failed to provide the Court with any of Malloy's medical records.

There is data indicating that "[i]ncarcerated people are at risk for fatness and weight gain based on several factors, including but not limited to gender, sexuality, race, sedentary lifestyles, lack of access to exercise, substance withdrawal, poor diets, stress, depression, side effects of psychotropic medication, and age." Rabia Belt, *The Fat Prisoners' Dilemma: Slow Violence, Intersectionality, and a Disability Rights Framework for the Future*, 110 Geo. L.J. 785, 788 (2022) *see also id.* at 795 (citing M. K. Gebremariam, R. A. Nianogo & O. A. Arah, *Weight Gain During Incarceration: Systematic Review and Meta-Analysis*, 19 OBESITY REVS. 98, 107 (2018); *Madison L. Gates & Robert K. Bradford, The Impact of Incarceration on Obesity: Are Prisoners*

*with Chronic Diseases Becoming Overweight and Obese During Their Confinement?*, 2015 J. OBESITY 1, 3-4, https://downloads.hindawi.com/journals/jobe/2015/532468.pdf.)).

In light of the pandemic, some courts have found that obesity, or even borderline obesity, can serve as a basis for compassionate release. *See, e.g.*, *United States v. Smith*, 538 F. Supp. 3d 990, 995 (E.D. Cal. 2021) ("Many courts have also found that people who have a body mass index within the ranges defined as 'overweight' or 'obese' are at greater risk of severe COVID-19."); *United States v. Staten*, PJM-01-284-4, 2020 WL 4904270, at *2 (D. Md. Aug. 18, 2020) (finding an "extraordinary and compelling reason" for compassionate release based on a BMI of 38); *United States v. Williams*, PWG-19-134, 2020 WL 3073320 (D. Md. June 10, 2020) (finding obese defendant with a BMI of 32.5 qualified for compassionate release in light of COVID-19); *United States v. Dawson*, ADM-18-40085, 2020 WL 1812270, at *7 (D. Kan. Apr. 9, 2020) (granting compassionate release based on the defendant's obesity).[12]

Moreover, the "risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*, https://bit.ly/38S4NfY.  Numerous judges have found extraordinary and compelling circumstances

---

[12] The CDC also lists substance use disorders as a medical condition that renders an individual at greater risk due to COVID-19. *People with Certain Medical Conditions*, *supra*, https://bit.ly/38S4NfY. The record indicates that Malloy has a "deep rooted history of substance abuse." ECF 16, ¶ 70. Indeed, Malloy smoked marijuana from the age of nine up until his incarceration. *Id.* And, the National Institutes of Health has indicated that "[s]moking . . . marijuana . . . has been shown to worsen lung conditions like . . . asthma . . . and chronic lung diseases can make a person more likely to get severely ill from COVID-19." Dr. Nora D. Volkow, *COVID-19 & Substance Use*, National Institute on Drug Abuse, https://nida.nih.gov/research-topics/comorbidity/covid-19-substance-use (last accessed Apr. 7, 2023).

Prior to defendant's incarceration, he also "drank beer to intoxication two to three times per week." ECF 16, ¶ 70.  The CDC includes alcohol in the list of substance use disorders that constitute a COVID-19 risk factor. *People with Certain Medical Conditions*, *supra*, https://bit.ly/38S4NfY.

for defendants with multiple chronic medical conditions. *See, e.g.*, *United States v. Azianbidji*, PWG-17-253, 2021 WL 307416, at *1 (D. Md. Jan. 29, 2021) (defendant with hyperlipidemia, hypertension, and obesity); *United States v. White*, CCB-09-369, 2020 WL 3960830, at *2-3 (D. Md. July 10, 2020) (defendant with neutropenia, hyperlipidemia, hypertension, heart disease, chronic kidney disease, and obesity); *United States v. Hilow*, JD-15-170, 2020 WL 2851086, at *4 (D.N.H. June 2, 2020) (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline obesity); *United States v. Quintero*, 458 F. Supp. 3d 130, 132 (W.D.N.Y. 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension constituted an extraordinary and compelling reason); *United States v. Zukerman*, 451 F. Supp. 3d 329, 336 (S.D.N.Y. 2020) (concluding that defendant's diabetes, hypertension, obesity, and age satisfied extraordinary and compelling reason); *United States v. Ullings*, 1:10-CR-00406, 2020 WL 2394096, at *4 (N.D. Ga. May 12, 2020) (finding defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Foreman*, 3:19-CR-62 (VAB), 2020 WL 2315908, at *4 (D. Conn. May 11, 2020) (finding defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Quintero*, CR-08-6007L, 2020 WL 2175171, at *1 (W.D.N.Y. May 6, 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension satisfied an extraordinary and compelling reason).

However, Malloy's decision to refuse the COVID-19 vaccine weighs against him, and substantially weakens his argument for compassionate release. As the government notes (ECF 32 at 7), and as defendant's concedes (ECF 29 at 3), Malloy declined an opportunity to receive the COVID-19 vaccine.

The CDC has emphasized that "COVID-19 vaccines are effective at helping protect against severe disease and death from variants of the virus that causes COVID-19 currently circulating, including the Delta variant," and that "[w]idespread vaccination is a critical tool to help stop the pandemic." *Key Things to Know about COVID-19 Vaccines*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html (updated July 20, 2022). And, I previously joined a growing number of district court judges across the country, including in the District of Maryland, in reasoning that a prisoner's refusal to obtain a COVID-19 vaccine significantly undermines the claim that his susceptibility to the effects of COVID-19 constitutes grounds for compassionate release.

As Judge Gallagher of this Court has observed: "Courts now widely recognize that a refusal to take preventative measures to protect oneself from COVID-19 undermines any assertion that the risk of viral infection constitutes an extraordinary and compelling reason justifying release . . . . Any decision to the contrary would create a perverse incentive in favor of declining the vaccine, undermining the BOP's efforts to protect its incarcerated population and to allow prison operations to return to some degree of normalcy in the coming months." *United States v. Ayres*, SAG-04-004, 2021 WL 2352322, at *2 (D. Md. June 9, 2021) (collecting cases); *see United States v. Dempsey*, TNM-19-368, 2021 WL 2073350, at *3–4 (D.D.C. May 24, 2021) (reasoning similarly); *United States v. Smith*, SAG-20-47, 2021 WL 1733457, at *2 (D. Md. May 3, 2021); *accord United States v. Simpson*, SAG-16-0398, 2021 WL 2260379, at *2 (D. Md. June 3, 2021); *United States v. Cain*, JAW-16-00103, 2021 WL 2269974, at *7 (D. Me. June 3, 2021); *United States v. Brice*, SAG-07-0261, 2021 WL 1926713, at *3 (D. Md. May 13, 2021); *United States v. Ortiz*, JFL-18-00264, 2021 WL 1422816, at *4 (E.D. Pa. Apr. 15, 2021); *United States v. Piles*, JDB-19-292-5 (JDB), 2021 WL 1198019, at *3 (D.D.C. Mar. 30, 2021) (collecting cases); *United*

*States v. Siegel*, TDC-03-0393, 2021 WL 962491, at *2 (D. Md. Mar. 15, 2021); *United States v. Reynoso*, 525 F. Supp. 3d 253, 255 (D. Mass. 2021).

The vaccine is central to preventing dangerous mutations. *See, e.g.*, *Another Reason To Get Vaccinated? To Stop Variants From Developing*, HENRY FORD HEALTH SYS. (Sept. 27, 2021), https://www.henryford.com/blog/2021/09/get-vaccinated-to-stop-variants. Moreover, "vaccines are the best way to protect [an individual] and others against COVID-19." Dr. Francis Collins, *Latest on Omicron Variant and COVID-19 Vaccine Protection*, NIH DIRECTOR'S BLOG (Dec. 14, 2021), https://directorsblog.nih.gov/2021/12/14/the-latest-on-the-omicron-variant-and-vaccine-protection/. "A prisoner has the right to refuse vaccination, but the courts have rightly cast a skeptical eye on prisoners who refuse vaccination while simultaneously claiming that only release from prison will relieve the danger of COVID-19." *United States v. Allen*, KM-18-216, 2023 WL 314351, at *7 (D.N.J. Jan. 19, 2023). "At the end of the day, district judges are not epidemiologists." *United States v. Sherrod*, AJT-19-20139, 2021 WL 3473236, at *5 (E.D. Mich. Aug. 6, 2021).

I recognize that Malloy filed his Motion in October 2021. Time has elapsed since the filing, through no fault of Malloy. In the time that has passed, Malloy may have been vaccinated. And, if not, he might have opted to receive the vaccine if the Court had been able to inform him in a more timely manner of the consequences of a failure to vaccinate. Under the circumstances of this case, Malloy's refusal to vaccinate will not undermine his Motion. *See United States v. Coleman*, PWG-17-393, WL 356724, at *3 (D. Md. Feb. 7, 2022) (determining that, in light of the dynamic nature of the COVID-19 pandemic and the absence of any information concerning the inmate's vaccination status, defendant's underlying medical conditions qualified as an extraordinary and compelling reason for his release).

In sum, I am satisfied that Malloy satisfies the "extraordinary and compelling" prong of the § 3582 analysis, based on his medical conditions. That determination does not end the inquiry, however.

**B.**

The coronavirus is not "tantamount to a 'get out of jail free' card." *United States v. Williams*, PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.). Even when a court finds extraordinary and compelling reasons for compassionate release, relief is warranted under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of factors set forth in 18 U.S.C. § 3553(a). *See High*, 997 F.3d at 186; *see also United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam). These factors include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims. *High*, 997 F.3d at 186. The Court must also consider the factors set forth in 18 U.S.C. § 3142(g), including the nature and circumstances of the offense, the history and characteristics of the defendant, and the danger that release would pose to any person or the community. U.S.S.G. § 1B1.13(2).

The defendant's criminal history is entirely drug related, with no history of violence. Three of his prior offenses involved possession of marijuana. *See* ECF 16, ¶¶ 24, 26, 32. He also has two prior felony drug convictions. *Id.* ¶¶ 28, 34. However, it does not appear that defendant ever served a sentence in the State system as lengthy as the one he is now serving. And, given the two

prior felony drug offenses, Malloy was classified as a career criminal. *Id.* ¶ 39.   This had a significant impact on defendant's offense level, criminal history category, and Guidelines.

Malloy asserts that he "has learned the importance of following the law and has improved himself while in prison."  ECF 29 at 6. To that end he claims that he "is not a risk to the community and has learned from his poor decision which caused him to break the law." *Id.* at 7. In addition, Malloy notes "his desire to help others" and "to be a productive citizen of his community." *Id.*

Notably, the government does not indicate that Malloy has been disciplined while incarcerated. Instead, the government's sole basis for asserting that the factors set forth § 3553(a) support the denial of Malloy's motion is that "[d]efendant agreed 'that a sentence of 144 months to be served concurrent to his term of incarceration in criminal case number MD013015J/12K11000980 is the appropriate disposition of this case.'" ECF 32 at 19.  And, in a footnote, the government states that, if the Court grants the Motion, it should require a 14-day transition period for Malloy to receive medical clearance and other pre-release assistance. ECF 32 at 19 n. 12.

Malloy's behavior while in BOP custody is an important indicator of whether he remains a danger to the community.  *See* 18 U.S.C. § 3582(c)(1)(A)(ii).  Courts place significant weight on a defendant's post-sentencing conduct because it "provides the most up-to-date picture of [his] 'history and characteristics.'"  *Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)); *see also Lancaster*, 997 F.3d at 175 ("And in considering the § 3553(a) factors, the court can take into account a defendant's conduct after his initial sentencing."); *United States v. McDonald*, 986 F.3d 402, 410-12 (4th Cir. 2021) (noting that on a motion to reduce sentence under the First Step Act, district court must consider defendant's post-sentencing conduct); *United States v. Rudisill*, 834 Fed. App'x 827, 829 (4th Cir. 2021) (finding district judge abused his discretion

in denying motion under the First Step Act without addressing defendant's post-sentencing conduct). Malloy's rehabilitation is "a significant factor" in determining whether a sentence reduction is warranted. *United States v. Ogun*, \_\_\_F.Supp.3d\_\_\_, 2023 WL 2207114, at \*10 (E.D. Va. Feb. 24, 2023).

In addition, I am mindful that defendant's incarceration in the midst of a global pandemic has "sufficiently increased the severity of the sentence beyond what was originally anticipated such that the purposes of sentencing are fully met even with the proposed reduction*." United States v. Green*, TDC-10-761, 2020 WL 2992855, at \*4 (D. Md. June 4, 2020); *see also United States v. Park*, No. 16-cr-00473, 2020 WL 1970603, at \*5, 456 F. Supp. 3d 557 (S.D.N.Y. Apr. 24, 2020) (noting that a sentence "that was sufficient but no greater than necessary" may now, in light of COVID-19, become "one immeasurably greater than necessary").

If Malloy were not a career offender, his Guidelines would have called for a sentence ranging from 70 to 87 months of imprisonment.  The defendant has been in custody since November 16, 2013.  As I see it, the period of incarceration that Malloy has served to date is sufficient to warrant his early release.  In light of Malloy's medical condition, and his conduct while incarcerated, I am of the view that a reduction of Malloy's sentence is appropriate.  I conclude that a sentence of time-served plus fourteen days is "sufficient, but not greater than necessary" to comply with the purposes of incarceration.  *See* 18 U.S.C. § 3553(a).  The purpose of the fourteen days is to allow for essential planning for the defendant's release and successful transition to the community

## V.  Conclusion

For the reasons set forth above, I shall grant the Motion.  I shall reduce the defendant's sentence to time served plus fourteen days.  I shall also reimpose the original terms of supervised

release.

An Order follows, consistent with this Memorandum Opinion.

Date: April 11, 2023                         _____/s/_____
                                             Ellen L. Hollander
                                             United States District Judge